UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CAROL LARSON, *personal representative of the estate of Patricia Pearcy*,

Plaintiff,

vs.

JACKSON NATIONAL LIFE INSURANCE COMPANY,

Defendant.

Case No. 2:23-cv-00354-RSL

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This matter comes before the Court on "Defendant Jackson National Life Insurance Company's Motion for Summary Judgment" and "Plaintiff Carol Larson's Motion for Partial Summary Judgment." Dkts. 96 and 99. Having reviewed the parties' memoranda, the record of the case, and the relevant legal authority, the Court resolves the motions as follows.

## BACKGROUND

In 1997, defendant Jackson National Life Insurance Company ("Jackson") issued Patricia Pearcy a federally tax-qualified long-term-care insurance policy (the "Policy").[1] The Policy provides benefits for qualifying long-term-care services when the insured satisfies its eligibility requirements. Plaintiff Carol Larson, Pearcy's daughter and attorney-in-fact, subsequently sought benefits under the Policy for Pearcy's care.

This action arises from Jackson's handling of those requests.[2] Plaintiff alleges that she first submitted a claim for benefits in April 2019, which Jackson verbally denied shortly thereafter. Dkt. 1-2 ¶¶ 5.7–5.10. She asserts that she submitted another claim in October 2019, after Pearcy moved to Normandy Park Senior Living ("Normandy Park"), and that Jackson denied that claim on January 3, 2020. *Id.* ¶¶ 5.14, 5.21. Plaintiff further alleges that, after she asked Jackson in February 2020 to reconsider the January 3 denial, Jackson again wrongfully denied coverage on April 3, 2020. *Id.* ¶¶ 5.25–5.28. Finally, plaintiff alleges that she submitted another request for benefits on April 1, 2022, which Jackson denied on September 9, 2022. *Id.* ¶¶ 5.40, 5.70.

---

[1] Jackson requested oral argument, but the Court deems it unnecessary for the disposition of these motions. *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

[2] The Policy was issued by Jackson National Life Insurance Company, but Continental Casualty Company—referred to in the record as "CNA"—administered the Policy and bore the financial risk associated with it. CNA retained illumifin Corporation ("illumifin") as a third-party administrator to perform the day-to-day administration of claims, and illumifin issued any benefit payments from CNA's funds. Dkt. 102-2 at 7–9. Because Jackson is the named insurer and defendant, the Court generally refers to actions taken in administering Pearcy's claims as actions by "Jackson," while identifying CNA or illumifin when the identity of the particular entity is material to the analysis.

Jackson characterizes the claim history differently. According to Jackson, plaintiff submitted her first claim in September 2019, and Jackson denied it on January 3, 2020. Plaintiff requested reconsideration in February 2020, and Jackson reaffirmed the denial on April 3, 2020. Jackson maintains that plaintiff submitted a second claim on April 1, 2022. Jackson administratively closed that claim in early August 2022 for failure to provide requested information, reopened it later that month, and denied it on September 9, 2022. Plaintiff subsequently submitted another claim on August 15, 2023, which Jackson approved and under which it paid benefits.

The parties thus disagree about the number and timing of plaintiff's benefit claims and Jackson's responses. The pending motions, however, concern two requests: the claim submitted in September or October 2019 and the claim submitted on April 1, 2022. The Court therefore declines to adopt either party's numbering convention and instead refers to the relevant claims as "the 2019 Benefit Claim" and "the April 2022 Benefit Claim."

Plaintiff filed this action on February 2, 2023, asserting claims for breach of contract, violation of the Washington Consumer Protection Act ("WCPA"), insurance bad faith, and violation of the Insurance Fair Conduct Act ("IFCA"). The parties now cross-move for summary judgment. The facts bearing on their particular arguments are set forth in the corresponding sections of the Court's analysis.[3]

[3] The parties have also filed cross-motions to exclude certain expert testimony. Dkts. 93 and 94. The Court need not resolve those motions to decide the pending summary-judgment motions. In conducting the present analysis, the Court has considered medical opinions only to the extent they concern matters within the witness's medical expertise and has not relied on expert interpretations or applications of the Policy, legal conclusions regarding whether Jackson acted in good faith, or nonmedical opinions concerning Pearcy's medical condition. Because the

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering cross-motions for summary judgment, the Court evaluates each motion separately on its own merits, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party with respect to each motion. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The Court considers the evidentiary materials submitted in support of and opposition to both motions before ruling on either. *Id*.

## DISCUSSION

### A. The Parties' Summary Judgment Arguments

Plaintiff moves for partial summary judgment on her bad-faith and WCPA claims and on Jackson's proof-of-loss defense. She asks the Court to conclude as a matter of law that Jackson acted in bad faith and violated Washington's claims-handling regulations by refusing to pay benefits without conducting a reasonable investigation and by failing to adopt and implement reasonable standards for the prompt investigation of claims. She also asks the Court to reject Jackson's interpretation and application of the Policy's proof-of-loss provision.

---

remaining challenges concern the scope and admissibility of testimony at trial, the Court reserves ruling on the motions to exclude for a separate order.

Jackson, in turn, moves for summary judgment on each of plaintiff's causes of action. As a threshold matter, Jackson argues that the IFCA and bad-faith claims arising from the 2019 Benefit Claim are barred by the applicable statutes of limitations and that the related breach-of-contract claim is barred by the Policy's "Limitations on Legal Actions" provision. Jackson further contends that plaintiff's failure to comply with the Policy's "proof-of-loss" requirement independently precludes recovery of benefits associated with the 2019 Benefit Claim.

On the merits, Jackson maintains that Pearcy was not eligible for benefits for the periods encompassed by the 2019 and April 2022 Benefit Claims because she did not satisfy the Policy's requirements for benefits. Jackson further argues that, even if benefits were payable, its investigation and coverage decisions were reasonable and therefore cannot support plaintiff's bad-faith, IFCA, or WCPA claims.

### B. Threshold Issues

The Court first addresses Jackson's threshold arguments concerning the timeliness of plaintiff's IFCA, bad-faith, and breach-of-contract claims arising from the 2019 Benefit Claim, including Jackson's reliance on the Policy's "Limitations on Legal Actions" provision and the parties' competing arguments regarding the Policy's proof-of-loss requirement.

#### 1. Timeliness of the IFCA and Bad-Faith Claims Based on the 2019 Benefit Claim

Before addressing Jackson's timeliness arguments regarding plaintiff's IFCA and bad-faith claims, the Court clarifies the scope of those claims. Jackson characterizes both

claims as arising from its investigation, denial, and reconsideration of the 2019 Benefit Claim. Plaintiff, however, frames the claims more broadly. The complaint and her summary judgment briefing make clear that she bases her IFCA and bad-faith claims on Jackson's handling of both the 2019 Benefit Claim and the April 2022 Benefit Claim. Although Jackson acknowledges that the April 2022 Benefit Claim sought benefits both retroactively and prospectively, it treats that submission as a reassertion of the previously denied 2019 Benefit Claim when addressing the timeliness of plaintiff's IFCA and bad-faith claims. It therefore does not separately argue that those claims are untimely to the extent they arise from Jackson's handling of the request for benefits for later service periods. Accordingly, the Court addresses Jackson's statutory timeliness defenses only to the extent the IFCA and bad-faith claims arise from the 2019 Benefit Claim.

**a. The IFCA claim**

An IFCA claim is subject to a three-year statute of limitations.[4] RCW 4.16.080(2); *Segar v. Allstate Fire and Casualty Ins. Co.*, 2022 WL 102035, *7 (W.D. Wash. Jan. 11, 2022). The claim accrues when the insurer unreasonably denies coverage or payment of benefits. *Id*. Under Washington's discovery rule, accrual occurs when the claimant discovers, or reasonably should discover, the salient facts underlying the elements of the IFCA claim—not when the claimant later obtains additional evidence supporting an

[4] The parties agree that Washington law governs plaintiff's claims.

existing claim. *1000 Virginia Ltd. Partnership v. Vertecs Corp.*, 158 Wn.2d 566, 575–76 (2006).

Jackson argues that plaintiff's IFCA claim arising from the 2019 Benefit Claim accrued on January 3, 2020, when Jackson denied benefits. Because plaintiff did not commence this action until February 2, 2023, Jackson contends that the claim is barred by IFCA's three-year statute of limitations. Plaintiff agrees that the three-year limitations period applies but maintains that her February 2020 submission initiated a new claim for benefits that Jackson did not deny until April 3, 2020, rendering her IFCA claim timely. The parties' accrual dispute therefore initially turns on the scope of the 2019 Benefit Claim—specifically, whether the February 2020 submission initiated a new claim or merely sought reconsideration of Jackson's January 3 denial.

**1) Whether the February 2020 Submission Initiated a New Claim**

The February 2020 submission itself strongly supports the reconsideration characterization. Larson captioned the February 20 letter "Review Request of Denial of Coverage" and began: "This is a request for a review of the denial of coverage" generated on January 3, 2020. Dkt. 102-11 at 2. She further explained that the letter's purpose was to provide additional information that had not been available during Jackson's "initial assessment of coverage," including a recently completed neuropsychological evaluation. Dkt. 102-11 at 2–3. Plaintiff's subsequent descriptions are consistent with that contemporaneous characterization. The complaint alleges that Larson "requested Jackson reconsider its denial," after which Jackson referred "the claim" to management for a

"second review" and informed Larson on April 3 that it was "upholding its denial of benefits." Dkt. 1-2 ¶¶ 5.25–5.28. The complaint later describes the April 3 determination as a "reaffirmed denial." *Id.* ¶ 5.30. Plaintiff's summary-judgment briefing uses similar language. She characterizes the April 3 determination as Jackson "again" denying coverage and states that the January denial "expressly invited reconsideration" and that Jackson subsequently "undert[ook] reconsideration of a claim," although plaintiff maintains that the resulting denial was independently actionable. Dkt. 115 at 8; Dkt. 125 at 5.

The manner in which Jackson processed the February 2020 request likewise indicates that it was a request for reconsideration rather than a new claim. Neither party identifies evidence that Jackson assigned a new claim number, opened a separate claim file, issued a new claim packet, or required Larson to initiate a new proof-of-loss process. Instead, Jackson's claim records describe Larson's submission as a request for "reconsideration of [the] denial" based on additional documentation that had not been available during the initial review and identify the resulting evaluation as a "RECONSIDERATION REVIEW." Dkt. 98-11 at illumifin_001412–13. Jackson's March 11 correspondence likewise advised Pearcy that Larson's request for reconsideration had been referred to claims management for "a second review of [her] claim file." *Id.* at illumifin_001414. The April 3 letter stated that Jackson had "re-review[ed] [Pearcy's] eligibility for benefits" and determined to "uphold the original denial of benefits." Dkt. 102-4 at JN 000224. It further explained that the new evidence

did not warrant "a change in the coverage position communicated in [Jackson's] letter dated January 3, 2020." *Id*. The record therefore shows that Jackson evaluated whether the additional information warranted changing its existing coverage decision; it did not make an initial determination on a newly opened claim.

The parties cite no caselaw establishing a formal test for distinguishing a new insurance claim from a request for reconsideration. Federal courts applying Washington law nevertheless make clear that, for limitations purposes, an insured does not restart the limitations period on a claim arising from an existing denial merely by asking the insurer to revisit that denial or by submitting additional evidence in support of the same request for benefits. In *Gonzales v. Allstate Insurance Co*., the court explained that a claimant cannot revive a stale wrongful-denial claim by making another demand or submitting what the claimant regards as important new evidence. No. C19-5569-BHS, 2020 WL 433353, at *4 (W.D. Wash. Jan. 28, 2020) ("Any other rule would make no sense: a plaintiff could revive a stale claim (or at least continue to re-start the limitations period) by making a new demand or providing what he claimed was important new evidence."). *See also Lenk v. Life Insurance Co. of North America*, No. CV-10-5018-LRS, 2010 WL 5173207, at *2 (E.D. Wash. Dec. 13, 2010) (holding that the plaintiff's bad-faith claim accrued when the insurer initially denied and closed his disability-benefits claim rather than when it later reaffirmed the denial on administrative appeal).

These cases support looking to the substance of the later submission: whether the insured sought payment for the same loss or benefit period and asked the insurer to

reconsider its existing determination, or instead presented a distinct loss or later period of benefits that could not have been adjudicated in the earlier decision. The February 2020 submission falls into the former category. It sought benefits arising from Pearcy's same placement and care at Normandy Park and challenged Jackson's determination that Pearcy had not established eligibility for those benefits. Larson submitted additional evidence concerning Pearcy's condition, but neither party identifies a distinct period of care, separate expenses, changed services, or a new qualifying event presented for an initial coverage determination. Jackson's review therefore addressed whether the new evidence justified reversing its existing denial, not whether Pearcy qualified for benefits under a newly submitted claim. The Court accordingly treats these events as one benefit claim, initiated after Pearcy entered Normandy Park in September 2019, denied on January 3, 2020, reconsidered in February 2020, and upheld on reconsideration on April 3, 2020.

Because Jackson's April 3, 2020 decision merely upheld its January 3, 2020 denial of the same claim, it did not restart the limitations period or create a new accrual date.

**2) Whether Larson Learned of the Denial on January 3, 2020**

The remaining question is whether Larson knew of the denial on January 3. Under Washington's discovery rule, a cause of action accrues when the plaintiff knew or, through the exercise of due diligence, should have known the essential elements of the claim. *Green v. A.P.C.*, 136 Wn.2d 87, 95–96 (1998). Accrual does not await the plaintiff's understanding of the legal consequences of the known facts or receipt of

conclusive proof supporting the claim. *Id.*; *Reichelt v. Johns-Manville Corp*., 107 Wn.2d 761, 772 (1987).

Plaintiff contends that the Court resolved that question in its prior order denying Jackson leave to amend its answer to assert a statute-of-limitations defense. Dkt. 55 at 2–3. In that order, the Court concluded that the proposed defense would be futile after treating January 15, 2020 as the date on which plaintiff received notice of the January 3 denial. That determination, however, rested on the record before the Court at the time. Although Jackson's denial letter was dated January 3, 2020, the evidence submitted with the motion to amend showed that the letter was not postmarked until January 15, 2020. Jackson identified no evidence that Larson had learned of the denial before the letter was mailed, and the Court therefore assumed, for purposes of the futility analysis, that the IFCA claim accrued on January 15. After applying the twenty-day tolling period triggered by plaintiff's presuit notice, the Court concluded that the February 2, 2023 complaint was timely. The summary-judgment record, however, is materially different. Moreover, the prior futility determination was interlocutory and may be revised before entry of final judgment. *See* Fed. R. Civ. P. 54(b).

Jackson has now produced an authenticated copy of the claim log notes relating to Pearcy's claims. Dkt. 98-3. The log reflects that an illumifin representative left Larson a voicemail on January 3 stating that a decision regarding her mother's claim had been made and that a letter had been drafted. It further reflects that Larson returned the call

that same day, completed the authentication process, and was advised that the "claim [was] denied." Dkt. 98-3 at JN 001011.

Although the claim-log entry is terse, it is sufficient to carry Jackson's initial burden on its statute-of-limitations defense because, if uncontroverted, it establishes that Larson learned of the denial on January 3, 2020. *See C.A.R. Transportation Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotes omitted) ("When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."). Plaintiff does not dispute that the January 3 conversation occurred, deny that Larson was informed of the denial, challenge the accuracy or admissibility of the claim log, or identify contrary evidence. Indeed, plaintiff admits that Jackson denied coverage on January 3. *See* Dkt. 99 at 13 (stating that "Defendant denie[d] coverage" on "January 3, 2020"). Once Jackson made the required evidentiary showing, plaintiff was required to identify specific evidence creating a genuine dispute of fact. *See Nissan Fire & Marine Insurance Co. v. Fritz Cos*., 210 F.3d 1099, 1103 (9th Cir. 2000) ("If . . . a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."); *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."). Because plaintiff has presented no evidence from which a reasonable factfinder could

conclude that Larson lacked notice of the denial on January 3, there is no genuine dispute of material fact regarding the accrual date.

The undisputed evidence therefore establishes that plaintiff's IFCA claim arising from the 2019 Benefit Claim accrued on January 3, 2020, when Jackson communicated its denial to Larson. The three-year limitations period expired on January 3, 2023. Plaintiff did not send her presuit IFCA notice until January 5, 2023. Dkt. 1-2 ¶ 5.74. Because the notice was not served "within the time prescribed for the filing of an action," it did not trigger the twenty-day tolling provision of RCW 48.30.015(8)(d). Plaintiff did not commence this action until February 2, 2023. The IFCA claim arising from the 2019 Benefit Claim is therefore time-barred, and Jackson is entitled to summary judgment on that claim.

**b. The Bad-Faith Claim**

Like an IFCA claim, a common-law insurance bad-faith claim is subject to a three-year statute of limitations. *Moratti v. Farmers Insurance Co. of Washington*, 162 Wn. App. 495, 502 (2011). Jackson similarly contends that plaintiff's bad-faith claim accrued in its entirety on January 3, 2020, when it initially denied the 2019 Benefit Claim. Plaintiff's bad-faith claim, however, challenges not only Jackson's denial of benefits, but also its handling of the claim, including the adequacy of its investigation during the subsequent reconsideration process.

Washington law recognizes that an insurer has an independent duty to investigate a claim fully and fairly and that an unreasonable investigation may support bad-faith

liability even if the insurer's coverage determination is ultimately correct. *Coventry Associates v. American States Insurance Co*., 136 Wn.2d 269, 279–81 (1998). Thus, although Jackson's April 3, 2020 decision upholding its prior denial did not, by itself, restart the limitations period, a bad-faith theory based on distinct claims-handling conduct first occurring during the reconsideration process on or after February 2, 2020—within three years of the filing of this action—is not time-barred.[5]

The summary-judgment record establishes that Jackson engaged in additional claims handling related to the 2019 Benefit Claim after February 2, 2020. As stated above, on February 20, 2020, Larson requested reconsideration and submitted a neuropsychological report that had not been previously before Jackson. Dkt. 102-11 at 2–10. Jackson considered this information before upholding the January 3 denial on April 3, 2020. Dkt. 102-4 at 1–2. Because plaintiff filed this action on February 2, 2023, that post-February 2, 2020 claims-handling conduct falls within the three-year limitations period. Jackson therefore has not established that plaintiff's bad-faith claim is untimely to the extent it rests on conduct that occurred during the reconsideration process. Therefore, the Court grants Jackson's motion on timeliness grounds to the extent the claim rests on

---

[5] Plaintiff's reliance on *Badell v. Celtic Life Insurance Co*., 159 F. Supp. 2d 1186 (N.D. Cal. 2001), is consistent with that distinction. *Badell* (applying California law) held that bad-faith claims based on the insurer's earlier denials remained time-barred despite its later reconsideration of the claim. *Id*. at 1192–93. The court separately held that a claim based on the insurer's later denial following reconsideration of new information was timely. *Id*. *Badell* therefore does not establish that the April 3, 2020 decision restarted the limitations period for bad-faith theories arising from Jackson's January 3 denial; it supports only the conclusion that the later reconsideration and denial may give rise to a separate, timely bad-faith theory.

conduct completed on or before January 3, 2020, and denies it to the extent the claim rests on subsequent reconsideration conduct. Whether that conduct was unreasonable or caused compensable harm is addressed in the merits analysis below.

### 2. Contractual Defenses to the Breach of Contract Claim Based on the 2019 Benefit Claim

Jackson next raises two related but distinct defenses to plaintiff's breach-of-contract claim. First, it contends that the claim arising from the 2019 Benefit Claim is barred by the Policy's "Limitations on Legal Actions" provision because plaintiff filed suit more than three years after written proof of loss was required. Second, Jackson argues that plaintiff cannot recover benefits for service periods for which she failed to submit adequate and timely proof of loss. Although both defenses turn in part on the Policy's proof-of-loss provisions, they serve different purposes: the contractual limitation governs when an action may be filed, while the proof-of-loss requirement governs whether plaintiff satisfied a condition of recovery for particular benefits. The Court therefore addresses the contractual limitation defense first and then considers Jackson's separate proof-of-loss argument.

#### a. The "Limitations on Legal Actions" Provision

The Policy requires the insured to provide written proof of loss "within 90 days after the end of the period for which You are claiming benefits." Dkt. 98-1 at JN 000552. It further provides: "If this is not possible, Your claim will not be affected. However, unless You are legally incapable, You must notify Us within one year from the time proof

is otherwise required." *Id*. The Policy's "Limitations on Legal Actions" provision, in turn, states:

> You cannot sue or bring legal action against Us:
>
> 1. before 60 days after We receive written proof of loss; or
> 2. more than three years after written proof of loss is required.

*Id*. at JN 000553.

Based on these provisions, Jackson argues that plaintiff's breach-of-contract claim is barred to the extent it seeks benefits arising from the 2019 Benefit Claim.[6] Jackson reasons that Pearcy opened the claim on September 17, 2019, that written proof of loss was therefore due 90 days later on December 16, 2019, and that the contractual period for filing suit expired on December 16, 2022. Because plaintiff did not commence this action until February 2, 2023, Jackson maintains that the breach-of-contract claim arising from the 2019 Benefit Claim is untimely.

Washington law requires that clear and unambiguous policy language must be enforced as written; as such, Jackson's calculation cannot be reconciled with the Policy's

---

[6] Jackson initially framed the defense more broadly, asserting in its opening motion—and again in its opposition to plaintiff's cross-motion—that the provision barred plaintiff's "causes of action" relating to the first benefit claim. Dkts. 96 at 17; 111 at 19. Plaintiff responded that a contractual suit-limitation provision applies only to breach-of-contract claims, not independent bad-faith, IFCA, or CPA claims. Dkt. 115 at 14–16. Although Jackson's reply continued to use broader shorthand in its introduction, its substantive analysis was titled "Plaintiff's Breach of Contract Claim Relating to her 2020 Claim is Untimely," and Jackson stated that the provision applies to the breach-of-contract claim "regardless of its application to extra-contractual claims." Dkt. 123 at 2, 4. Jackson also did not calculate a separate contractual deadline for the April 2022 Benefit Claim. The Court therefore construes Jackson's developed argument as limited to plaintiff's breach-of-contract claim arising from the 2019 Benefit Claim.

terms. *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK), PLC*, 200 Wn.2d 315, 321 (2022). The Policy measures the proof-of-loss deadline from "the end of the period for which" benefits are claimed, not from the date the claim was opened. Jackson nevertheless calculates the deadline from September 17, 2019 without identifying the relevant benefit period, establishing when that period ended, or explaining why the claim's opening date should be treated as the end of that period. Jackson therefore has not shown that proof of loss was due on December 16, 2019 or that the contractual limitations period expired before plaintiff filed this action. Its motion is denied on this ground.

**b. The Proof-of-Loss Provision**

As explained above, the Policy requires written proof of loss within 90 days after the end of the period for which benefits are claimed, subject to its exception when timely proof is not possible, and conditions payment on Jackson's receipt of "due written proof of loss." Dkt. 98-1 at JN 000552–53. The Policy further provides that, if Jackson does not furnish a claim form within 15 days after receiving notice, the insured may satisfy the written-proof requirement by submitting a written statement describing the type and nature of the loss. *Id*. at JN 000552.

Jackson contends that plaintiff failed to provide timely proof of loss for the earlier service periods included in the April 2022 Benefit Claim that Jackson treats as part of the 2019 Benefit Claim. In Jackson's view, the Policy imposes an independent and continuing obligation to submit "due written proof of loss" sufficient to determine

whether benefits are payable and, if so, in what amount. According to Jackson, Larson submitted no additional proof of loss after February 2020 until she initiated the April 2022 Benefit Claim. Although that later submission sought reimbursement for services dating back to 2020, Jackson argues that it could not retroactively cure the failure to provide timely proof for the earlier service periods Jackson treats as part of the 2019 Benefit Claim. Jackson further asserts that the delay prejudiced its ability to investigate those losses because the information had become stale, medical providers had relocated or no longer recalled Pearcy, and relevant Normandy Park personnel could not be located.

Plaintiff reads the Policy differently. She relies principally on the "How to File a Claim" provision and contends that an insured satisfies the Policy by completing the claim forms Jackson provides. In her view, the alternative requirement to submit a written statement describing the type and nature of the loss applies only when Jackson fails to provide a claim form. Plaintiff argues that Jackson provided the required forms and Larson completed and returned them. Therefore, plaintiff argues that she satisfied the Policy's written-proof-of-loss requirement. Plaintiff also emphasizes that Jackson did not cite deficient proof of loss as a basis for its claim denials. Accordingly, she asks the Court to reject as a matter of law any defense based on an alleged failure to provide proof of loss.

The Court agrees with Jackson on the threshold question of Policy interpretation. Under Washington law, an insurance policy must be viewed in its entirety, and the Court

may not interpret one provision in isolation but must attempt to give effect to each provision of the Policy. *Seattle Tunnel Partners,* 200 Wn.2d at 321. Plaintiff reads the "How to File a Claim" provision to mean that the written-proof-of-loss requirement arises only if Jackson fails to provide a claim form. That reading would deprive the Policy's separate "When to File a Claim" and "When Your Claim Is Paid" provisions of independent effect. The "How to File a Claim" provision requires Jackson to provide a claim form and identifies an alternative means by which the insured may submit proof if Jackson fails to do so. The separate "When to File a Claim" provision, however, independently states that the insured "must" submit written proof of loss within 90 days after the end of the period for which benefits are claimed. Dkt. 98-1 at JN 000552. The Policy further provides that Jackson will pay a claim after receiving "due written proof of loss." *Id*. at JN 000553. Read together, these provisions establish that Jackson's delivery of a claim form does not eliminate the insured's obligation to submit written proof of loss.[7]

Jackson's failure to identify deficient proof of loss as a basis for its denials presents a different issue. Washington law recognizes that an insurer may waive defects

[7] Plaintiff also relies on the fact that Jackson never requested a separate document identified as a "proof of loss." That fact does not establish that the Policy's requirement was inapplicable. The Policy does not require a particular document bearing that title; it requires written proof sufficient to substantiate the claimed loss. The relevant question is therefore whether the claim forms and other materials Larson submitted constituted due written proof for the particular benefits sought, not whether Jackson asked her to complete a document formally labeled "proof of loss."

in proof of loss, or be estopped from demanding additional or corrected proof, when it denies liability on other grounds under circumstances that would reasonably induce the insured to believe that submitting further proof would be futile. *Pagni v. New York Life Insurance Co*., 173 Wash. 322, 349–50 (1933). The omission of a proof-related defense from a denial, however, does not necessarily establish equitable estoppel. See e.g., *George v. Northwestern Mutual Life Insurance Co*., No. C10-668-RSM, 2011 WL 3881476, at *8 (W.D. Wash. Sept. 1, 2011) (insurer's failure to deny a claim as time-barred was not itself conduct inconsistent with asserting that defense in subsequent litigation). Equitable estoppel requires inconsistent conduct, reliance on that conduct, and resulting injury. *Id*.

The record does not establish waiver or estoppel as a matter of law. Jackson's denial letters did not identify inadequate proof of loss as a reason for denying benefits, but its January 3, 2020 letter invited Larson to submit new or corrected information for reconsideration, and Larson subsequently did so. Those circumstances do not compel the conclusion that Jackson led Larson to believe further proof would be useless or that she refrained from submitting proof in reliance on Jackson's stated grounds for denial. Plaintiff is therefore not entitled to summary judgment based on either her interpretation of the Policy or Jackson's failure to cite deficient proof in its denial letters.

That conclusion does not, however, establish that Jackson is entitled to summary judgment. Under Washington's notice-prejudice rule, an insurer may rely on untimely proof of loss to avoid liability only if it establishes actual and substantial prejudice caused

by the delay. *See Canron, Inc. v. Fed. Ins. Co*., 82 Wn. App. 480, 485 (1996). Jackson asserts that Larson's delay caused actual prejudice because the information concerning the earlier periods had become stale, Pearcy's doctors had moved or could no longer recall her, and Normandy Park had changed ownership and management, leaving no available representatives who had cared for Pearcy during the first claim period. Plaintiff disputes that the delay caused those investigative difficulties. She contends that Jackson had authorization to obtain medical information and could have contacted Pearcy's treating providers while their knowledge was current but chose not to do so. She also points out that Jackson denied the benefit requests based on its assessment of Pearcy's eligibility rather than an asserted inability to substantiate her care or expenses. The record therefore presents a genuine dispute regarding whether any delay in submitting proof materially impaired Jackson's ability to investigate or determine its obligations under the Policy.

Accordingly, plaintiff's motion is granted only to the extent she challenges Jackson's contention that the Policy imposes a categorical 90-day deadline measured from the date a claim is initiated. The Policy instead measures the deadline from the end of the particular period for which benefits are claimed. Plaintiff's motion is otherwise denied because she has not established as a matter of law that the proof-of-loss requirement did not apply or that Jackson may not rely on it as a defense. Jackson's motion is likewise denied because it has not established that plaintiff failed to provide adequate and timely proof for any specifically identified benefit period or that any delay

caused actual prejudice. Whether plaintiff submitted due written proof of loss for particular periods—and the effect of any failure to do so—must be determined on a period-specific basis.

### C. Merits

Having resolved the threshold timeliness and contractual-defense arguments, the Court now turns to the merits of plaintiff's claims. It begins with the breach-of-contract claim, and then addresses plaintiff's bad-faith, IFCA, and WCPA claims.

#### 1. The Breach of Contract Claim

Plaintiff contends that Jackson breached the Policy by denying benefits under the 2019 and April 2022 Benefit Claims. Resolution of that claim turns principally on whether Pearcy satisfied the Policy's requirements for payment of benefits. Jackson contends that she did not. Its arguments fall into three categories: whether Pearcy was certified as "Chronically Ill" by a Licensed Health Care Practitioner and was, in fact, chronically ill as defined by the Policy; whether she received qualified long-term-care services pursuant to a qualifying Plan of Care; and whether plaintiff timely and adequately documented the claimed losses. The Court addresses each category in turn.

##### a. Whether Pearcy Was "Chronically Ill" as Defined by the Policy

###### i. Governing Requirements

The Policy, as amended, provides: "To be eligible for benefits under this policy, [the insured] must be certified as Chronically Ill by a Licensed Health Care Practitioner at least once every 12 months." Dkt. 98-1 at JN 000558. The Policy defines an insured as

"Chronically Ill" if the insured is "[c]ertified by a Licensed Health Care Practitioner as" satisfying one of three criteria:

> 1. Being unable to perform (without substantial assistance from another individual) at least 2 Activities of Daily Living for a period of at least 90 days due to a loss of functional capacity ["the ADL Criterion"], or
>
> 2. Having a level of disability similar (as determined under regulations prescribed by the Secretary of the Treasury in consultation with the Secretary of Health and Human Services) to the level of disability described in clause 1 ["the Comparable-Disability Criterion"], or
>
> 3. Requiring substantial supervision to protect [themselves] from threats to health and safety due to severe Cognitive Impairment ["the Cognitive-Impairment Criterion"].

*Id*. The Policy also expressly provides benefits for Alzheimer's Disease: "[This] policy provides benefits, subject to all of its provisions, for nervous or mental disorders, including Alzheimer's Disease or senile dementia, which are determined by clinical diagnosis or tests." *Id*.

The Policy defines a "Licensed Health Care Practitioner ("LHCP")" as "[a]ny physician, registered professional nurse, or licensed social worker." *Id*. at JN 000542. It defines "Activities of Daily Living" as eating, dressing, bathing, toileting, transferring, and continence (collectively, "ADLs"). It further defines "Cognitive Impairment" as a "deficiency in [the insured's] short- or long-term memory, orientation as to person, place and time, deductive or abstract reasoning, or judgment as it relates to safety awareness." *Id*.

For each relevant period, plaintiff therefore must establish that Pearcy was certified, at least once every 12 months, by an individual who qualified as an LHCP, as satisfying at least one of the three chronic-illness criteria—the ADL Criterion, the Comparable-Disability Criterion, or the Cognitive-Impairment Criterion.

The Court first applies these requirements to the 2019 Benefit Claim.

**ii. The 2019 Benefit Claim**

**1) Whether the identified practitioners for the 2019 Benefit Claim qualified as LHCPs under the Policy**

Plaintiff relies on records from three practitioners to argue that Pearcy satisfied the Policy's certification requirement: a May 2019 neurological assessment by Nurse Practitioner Darla Chapman, a January 2020 neuropsychological report by Dr. Howard Lloyd, and a January 30, 2020 note by Dr. James Pense. Dr. Pense, Pearcy's primary-care physician, qualified as an LHCP under the Policy. Chapman was an A.R.N.P. and likewise fell within the Policy's definition of an LHCP as a registered professional nurse. Jackson disputes whether their records constituted qualifying certifications, but challenges only Dr. Lloyd's professional qualification as an LHCP. As stated above, the Policy defines an LHCP as "[a]ny physician, registered professional nurse, or licensed social worker." Dkt. 98-1 at JN 000542. Because Dr. Lloyd was a psychologist rather than a member of any listed profession, he did not fall within the Policy's express definition.

Plaintiff argues that the Policy must be read in conjunction with 26 U.S.C. § 7702B(c)(4), which defines an LHCP to include a physician, registered professional nurse, licensed social worker, "or other individual who meets such requirements as may be prescribed by the Secretary." She contends that Dr. Lloyd falls within the residual category because Washington licensed him to provide health-care services and relies on the Department of Health and Human Services' National Practitioner Data Bank Guidebook, which includes psychologists within its definition of health-care practitioners.

Neither authority establishes that Dr. Lloyd qualified under § 7702B(c)(4). The statute does not encompass every person licensed by a state to provide health-care services; it encompasses only other individuals who satisfy requirements "prescribed by the Secretary." Plaintiff identifies no Treasury regulation or other authority issued under § 7702B that includes clinical psychologists or neuropsychologists. The Guidebook, moreover, defines "health care practitioner" only "as used in this Guidebook" and explains that the NPDB collects and discloses information concerning medical-malpractice payments and adverse actions involving practitioners to entities authorized to report to or query the NPDB. Dkt. 116-12 at 48 (NPDB Guidebook C-1). It does not interpret § 7702B or purport to prescribe additional categories of LHCPs for tax-qualified long-term-care policies.

Accordingly, Dr. Lloyd did not qualify as an LHCP and could not, through his report alone, supply the certification required by the Policy that Pearcy was Chronically

Ill. His findings may nevertheless remain relevant to whether a qualifying LHCP adopted them in making an independent certification and to whether Jackson reasonably investigated the claim. The Court addresses those issues below.

**2) Whether an LHCP certified that Pearcy satisfied one of the enumerated chronic-illness criteria under the Policy for the 2019 Benefit Claim**

Having determined which practitioners qualified as LHCPs, the Court next considers whether any of them certified that Pearcy satisfied one of the Policy's three chronic-illness criteria. The Policy does not define "certified" or require a particular form or terminology. An LHCP therefore need not use the word "certify" or repeat the Policy's language verbatim, but the practitioner's record must, in substance, authoritatively attest that the insured satisfies at least one of the enumerated criteria. *See Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877 (1990) (undefined insurance-policy terms receive their "plain, ordinary, and popular meaning"); *Donohoe v. Dep't of Revenue*, No. TC-MD 150521N, 2016 WL 4446635, at *4 (Or. T.C. Mag. Div. Aug. 23, 2016) (defining "certify," for purposes of 26 U.S.C. § 7702B(c)(2), as "to attest [especially] authoritatively or formally" and holding that a nurse's letter and medical records satisfied the certification requirement).

Plaintiff principally relies on the Cognitive-Impairment Criterion. The Court therefore begins with that criterion before addressing the ADL and Comparable-Disability Criteria.

**a) The Cognitive-Impairment Criterion**

**Interpretive framework**. Under the Cognitive-Impairment Criterion, an LHCP must determine that the insured requires substantial supervision to protect against threats to health and safety because of severe cognitive impairment. The Policy defines "Cognitive Impairment," but it does not define when such an impairment is "severe" or what constitutes "substantial supervision." The Court must therefore construe those terms before determining whether plaintiff's evidence satisfies the Criterion.

Both parties rely on IRS Notice 97-31 in construing the terms. Because the Policy seeks tax-qualified status, substantially tracks 26 U.S.C. § 7702B(c)(2), and leaves the severity and supervision requirements undefined, the Notice provides relevant interpretive guidance. *See* Notice 97-31, 1997-1 C.B. 417, 419 (providing safe-harbor definitions of "severe cognitive impairment" and "substantial supervision"); *Qualified Long-Term Care Insurance Contracts*, T.D. 8792, 63 Fed. Reg. 68,184, 68,185–86 (Dec. 10, 1998) (recognizing those definitions and stating that taxpayers may continue to rely on Notice 97-31 for contracts issued on or before December 10, 1999).

IRS Notice 97-31 provides that cognitive impairment is "severe" when the loss or deterioration in intellectual capacity is "comparable to (and includes) Alzheimer's disease and similar forms of irreversible dementia," provided it is measured by clinical evidence and standardized testing. Notice 97-31, 1997-1 C.B. 417, 419 (the impairment must relate to the individual's "(i) short-term or long-term memory, (ii) orientation as to people, places, or time, and (iii) deductive or abstract reasoning"). The Notice defines

"substantial supervision" as continual supervision (including cueing, gestures, or other demonstrations) necessary to protect a severely cognitively impaired individual from threats to health or safety. *Id*. The Court therefore construes "severe cognitive impairment" for purposes of the Cognitive-Impairment Criterion as a loss or deterioration in intellectual capacity that is comparable to Alzheimer's disease or a similar form of irreversible dementia and is measured by clinical evidence and standardized testing. "Substantial supervision" means continual supervision necessary to protect the insured from threats to health or safety. Thus, an Alzheimer's diagnosis supported by clinical evidence and standardized testing may satisfy the severity component of the Cognitive-Impairment Criterion. Such a diagnosis does not, standing alone, establish that the insured is "Chronically Ill" under that Criterion because, per the terms of the Policy, an LHCP must also determine that the insured requires substantial supervision due to the severe cognitive impairment. *See* Dkt. 98-1 at JN 000558 (providing benefits for Alzheimer's disease "subject to all of [the Policy's] provisions").

With this framework in mind, the Court turns to whether plaintiff's evidence related to the 2019 Benefit Claim satisfies the Cognitive-Impairment Criterion.

**The MyChart materials**. Plaintiff first points to a November 2019 MyChart "Current Health Issues" page from Pearcy's account. Larson submitted the page to Jackson with a letter dated November 21, 2019, that she wrote on Pearcy's behalf in support of the 2019 Benefit Claim. The MyChart page lists "MCI (mild cognitive impairment) with memory loss" as one of Pearcy's medical conditions and Larson's letter

explained that Pearcy had been treated for the impairment since August 2017, including that Dr. Pense had prescribed Namenda to treat Pearcy's related memory problems. Dkt. 102-10 at JN 000135–36.

The Court concludes that the MyChart page and accompanying letter do not satisfy the Cognitive-Impairment Criterion. Neither document establishes that Dr. Pense made the "MCI (mild cognitive impairment) with memory loss" diagnosis, describes the clinical basis for the entry, or reflects a determination by an LHCP that Pearcy had severe cognitive impairment or required substantial supervision. Larson's characterization of Pearcy's treatment history likewise does not constitute an LHCP certification. At most, this evidence simply establishes that Pearcy had a documented history of mild cognitive impairment dating to 2017.

**Nurse Practitioner Chapman's assessment**. Plaintiff next relies on Nurse Practitioner Chapman's May 29, 2019 neurological assessment. Chapman recorded a history, provided principally by Larson, of cognitive changes with an "insidious onset and gradual progression over the last several years" and recent worsening. Based on that history, her neurological examination, review of diagnostic information, and cognitive screening, Chapman described Pearcy's presentation as "suspicious for dementia due to Alzheimer's disease" and recorded a MoCA score of 15 out of 30. Dkt. 116-6 at 32, 35 (MULTICARE 000351, 000354). Her assessment therefore provided clinical evidence and cognitive screening consistent with impairment against a history, reported principally by Larson, of progressive decline. Chapman did not, however, diagnose Alzheimer's

disease or another form of irreversible dementia, characterize Pearcy's cognitive impairment as severe, or determine that Pearcy required continual supervision to protect herself from threats to health or safety. Although Chapman noted that Pearcy had some difficulty managing her medications and had become lost on one occasion while driving, she also reported that Pearcy was "[i]ndependent in bathing, dressing, [and] grooming," ambulated without an assistive device, could plan meals, shop, cook, use appliances, perform household chores, and manage her finances, and otherwise drove without difficulty. *Id*. at 32–33 (MULTICARE 000351–52). Those findings do not reflect an authoritative determination that Pearcy required continual supervision to protect herself from threats to health or safety. Chapman's assessment therefore does not certify that Pearcy satisfied the Cognitive-Impairment Criterion.

**Dr. Pense's January 30, 2020 note**. Finally, plaintiff relies on Dr. Pense's January 30, 2020 note. Because Dr. Pense reviewed and relied in part on Dr. Lloyd's neuropsychological evaluation, the Court first describes the findings and diagnosis contained in that report. On January 9, 2020, Dr. Lloyd conducted an in-person neuropsychological evaluation of Pearcy following Nurse Practitioner Chapman's referral. The evaluation included a clinical interview and a battery of standardized tests assessing memory, attention, language, visuospatial abilities, and executive functioning. Dr. Lloyd found significant memory impairment marked by rapid forgetting of newly learned information and an inability to retain new verbal or visual material after a delay. He also identified evidence of executive dysfunction and impairment in confrontation

naming. Dr. Lloyd concluded that the overall pattern of results was consistent with cortical dementia, “most likely due to Alzheimer’s disease,” and diagnosed Pearcy with “Major Neurocognitive Disorder due to Alzheimer’s Disease, late onset, without behavioral disturbance.” Dkt. 102-11 at 3–7. As explained above, Dr. Lloyd did not qualify as an LHCP, so his report could not independently supply the certification required by the Policy. The report nevertheless remains relevant as clinical evidence and standardized testing that Dr. Pense considered when assessing Pearcy later that month.

Dr. Pense’s note documents a January 30, 2020 office visit following Dr. Lloyd’s evaluation. Dr. Pense reviewed the evaluation and recorded that Pearcy had difficulty recalling recent events, misplaced her keys, had difficulty finding her way home, looked to her daughter for assistance answering questions, and was unable to bathe without significant help. Dkt. 101-4 at 1. On examination, he noted severe cognitive impairment and poor short-term memory. He concluded: “I would categorize her cognitive impairment as extreme. She needs significant help and care.” *Id*. at 2–3.

Jackson argues that Dr. Pense’s note was insufficient because the doctor did not independently perform standardized testing, relied on Dr. Lloyd’s evaluation, and did not expressly determine that Pearcy satisfied the Cognitive-Impairment Criterion. Neither the Policy nor IRS Notice 97-31 requires the certifying LHCP to personally administer the standardized testing underlying the certification. The Notice requires severe cognitive impairment to be measured by clinical evidence and standardized testing, but it does not state that the certifying LHCP must personally conduct the testing. Notice 97-31, 1997-1

C.B. 417, 419. Although Dr. Lloyd's status as a non-LHCP prevented him from independently supplying the contractual certification, Jackson identifies no provision that prohibited Dr. Pense from considering Dr. Lloyd's clinical findings, testing, and diagnosis in making his own assessment.

Nor was Dr. Pense required to use the Policy's precise terminology. Illumifin's Rule 30(b)(6) designee testified that its claims handlers do not independently define "severe" or determine whether an insured's cognitive impairment is severe. Instead, they defer to the treating clinician's assessment, take that assessment at face value, and do not substitute their own judgment. Dkt. 102, Ex. 8, illumifin 30(b)(6) Dep. 118:1–7, 127:5–128:12, 185:10–20. That testimony confirms that severity is a matter of clinical judgment and undermines Jackson's suggestion that Dr. Pense's assessment was deficient merely because he characterized Pearcy's impairment as "extreme" rather than using the Policy's phrase "severe cognitive impairment."

Therefore, the Court concludes that a reasonable jury could find that Dr. Pense's characterization of Pearcy's cognitive impairment as extreme, considered together with Dr. Lloyd's standardized testing and Alzheimer's diagnosis, amounted to an authoritative determination that her cognitive impairment was severe. A reasonable jury could also find that Dr. Pense's documentation of Pearcy's difficulty finding her way home and her need for significant help and care amounted to a determination that she required continual supervision to protect her from safety threats. The record therefore presents a genuine

dispute as to whether Dr. Pense certified that Pearcy satisfied the Cognitive-Impairment Criterion.

**b) The ADL and Comparable-Disability Criteria**

Although plaintiff principally relies on the Cognitive-Impairment Criterion, the Court also considers whether the records constitute a certification under either of the Policy's remaining alternatives. Under the ADL Criterion, an LHCP must determine that the insured requires substantial assistance with at least two ADLs for a period of at least 90 days due to a loss of functional capacity. Neither the MyChart entry nor Nurse Practitioner Chapman's assessment reflects a determination that Pearcy required assistance with any ADL. Dr. Pense stated that Pearcy was unable to bathe without significant help, but bathing is only one ADL, and he did not determine that the limitation persisted for at least 90 days. None of the records therefore constitutes a certification under the ADL Criterion.

The Comparable-Disability Criterion requires an LHCP to determine that the insured has a level of disability similar, as determined under the applicable regulations, to the level required under the ADL Criterion. Plaintiff does not separately develop an argument that any LHCP made such a determination. In any event, although the records document cognitive and functional limitations, none assesses Pearcy's level of disability under the applicable regulations or determines that it was comparable to the level required under the ADL Criterion. The records therefore do not constitute a certification under the Comparable-Disability Criterion.

**3) Whether any certification satisfied the 12-month requirement for the 2019 Benefit Claim**

The Policy requires that the insured "be certified as Chronically Ill by a Licensed Health Care Practitioner at least once every 12 months." Dkt. 98-1 at JN 000558. Jackson argues that Dr. Pense's January 30, 2020 note cannot satisfy this requirement because plaintiff did not provide it to Jackson until January 2024, more than three years after it was written. According to Jackson, the note was therefore too old to serve as a valid certification and could not have been considered in evaluating the 2019 Benefit Claim. Dkt. 96 at 19.

Jackson's argument conflates the occurrence of a certification with its submission to the insurer. The Policy states that the insured must be certified at least once every twelve months; it does not state that the certification must also be furnished to Jackson within that period. Other provisions of the Policy separately govern the insured's obligation to submit due written proof of loss. Reading the Policy as a whole, the Court will not import that submission requirement into the annual-certification provision.

Thus, if a jury finds that Dr. Pense's January 30, 2020 assessment constituted a qualifying certification, the certification occurred on that date regardless of when plaintiff later provided the note to Jackson. Dr. Pense made the assessment less than five months after Pearcy entered Normandy Park and while Jackson was reconsidering the 2019 Benefit Claim. Jackson therefore has not established that no qualifying certification occurred within the relevant twelve-month period or identified any particular service

period that fell outside an applicable certification window. Whether plaintiff timely furnished the note as proof of the asserted certification, and the effect of any delay, are addressed in the proof-of-loss section below.

Viewing the evidence in the light most favorable to plaintiff, Jackson has not established as a matter of law that Pearcy failed to satisfy the Policy's chronic-illness certification requirement, including its twelve-month component, in connection with the 2019 Benefit Claim. The Court next applies the same requirements to the April 2022 Benefit Claim.

### iii. The April 2022 Benefit Claim

#### 1) Whether the identified practitioners for the April 2022 Benefit Claim qualified as LHCPs under the Policy

The Court's analysis of the 2019 Benefit Claim resolves the professional qualifications of several practitioners whose records also relate to the periods included in the April 2022 Benefit Claim. The additional individuals relevant to the April 2022 Benefit Claim are Sandra Kennedy, A.R.N.P.; Wendy Berg, a registered nurse; Linda Madden, a licensed practical nurse; and Katie Kemp, the Normandy Park employee who completed Jackson's Claimant Care Needs Assessment Form.

Jackson does not dispute that Kennedy qualified as an LHCP under the Policy. Berg likewise qualified as a registered nurse. Dkt. 98-15 at JN 000367, 000373. Madden, however, was an LPN. Because Washington law separately licenses registered nurses and licensed practical nurses, and the Policy includes only a "registered professional nurse,"

Madden did not qualify as an LHCP. *See* RCW 18.79.020(6), .030, .060. Kemp likewise did not qualify. She identified herself as Normandy Park's executive director and a certified nursing assistant and stated that she was not professionally credentialed. Dkt. 102-16 at 2–3.

**2) Whether an LHCP certified that Pearcy satisfied an enumerated chronic-illness criterion under the Policy for the April 2022 Benefit Claim**

Having determined that Kennedy and Berg qualified as LHCPs, while Madden and Kemp did not, the Court next considers whether a qualifying practitioner certified that Pearcy satisfied one of the Policy's chronic-illness criteria in connection with the April 2022 Benefit Claim. As explained above, the Policy does not require a particular certification form or prescribed terminology, but the record must, in substance, authoritatively attest that Pearcy satisfied at least one of the enumerated criteria. Plaintiff principally contends the relevant medical records establish a certification under the ADL Criterion. The Court therefore begins with that criterion before addressing the remaining alternatives.

**a) The ADL Criterion**

Under the ADL Criterion, an LHCP must determine that the insured is unable to perform, without substantial assistance from another individual, at least two ADLs for a period of at least 90 days due to a loss of functional capacity. The Policy does not define "substantial assistance." Notice 97-31 defines "standby assistance" as the presence of

another person within arm's reach that is necessary to prevent injury through physical intervention while the insured performs the ADL. Notice 97-31, 1997-1 C.B. 417, 419. The Notice further provides that "substantial assistance" includes both hands-on and standby assistance. *Id*. Thus, an LHCP may satisfy the assistance component of the ADL Criterion by determining that the insured requires either hands-on or standby assistance to perform the relevant ADLs.

Plaintiff relies on three related records to satisfy this criterion for the April 2022 Benefit Claim. First, Normandy Park prepared a change-in-condition assessment and accompanying Individual Service Plan dated January 25, 2022 (collectively, the "January 25 care documents"). The assessment identified Pearcy's condition and care needs, while the Individual Service Plan prescribed corresponding interventions, including daily orientation and activity reminders, assistance with Pearcy's morning and evening routines, set-up and standby assistance with bathing, daily medication administration, and other services. Dkt. 98-15 at JN 000337–42, 000367–73. Second, Nurse Practitioner Kennedy issued a prescription dated February 1, 2022, directing Pearcy to "[l]ive in ALF" and stating that she "[r]equires assistance with ADLs." Dkt. 101-5 at 2. Finally, Normandy Park submitted a Claimant Care Needs Assessment Form to Jackson in July 2022 reporting that Pearcy received standby assistance with bathing and dressing, as well as assistance with medication administration. Dkt. 102-16 at 2.

Neither the January assessment nor Kennedy's prescription, viewed in isolation, expressly addresses every element of the ADL Criterion. Because Berg signed the

Individual Service Plan and qualified as an LHCP under the Policy, the plan reflects an LHCP's written approval of standby assistance with bathing. It does not, however, identify a need for substantial assistance with a second ADL. Kennedy's use of "ADLs" in the plural indicates a need for assistance with more than one activity, but her prescription does not identify the particular ADLs, describe the degree of assistance required, or state that the limitations were expected to persist for at least 90 days. Nor is the July assessment sufficient standing alone. Kemp did not qualify as an LHCP, so the assessment cannot independently supply the required certification. It may, however, corroborate plaintiff's interpretation of Kennedy's contemporaneous prescription by identifying bathing and dressing as the ADLs for which Pearcy received standby assistance and providing evidence that those limitations continued through July 2022.

Thus, viewed collectively and in the light most favorable to plaintiff, the records would permit a reasonable jury to find that Kennedy's direction that Pearcy live in an assisted-living facility because she required assistance with multiple ADLs authoritatively attested to an ongoing need for substantial assistance with at least two ADLs due to a loss of functional capacity. Berg's assessment, completed one week before Kennedy issued the prescription, documented standby assistance with bathing, while Kemp's later assessment identified bathing and dressing as the two ADLs for which Pearcy received standby assistance. A jury could therefore infer that the ADLs to which Kennedy referred included bathing and dressing. Because Kennedy issued her prescription more than 90 days before Kemp completed the July assessment, a jury could

also infer that the need for assistance to which Kennedy referred persisted for the required period.

Jackson's contrary evidence does not eliminate that factual dispute. Jackson points to other portions of the January assessment and Individual Service Plan, as well as Normandy Park's May 18, 2022 assessment and Individual Service Plan (collectively, "the May 18 care documents"), which described Pearcy as independent in many respects. Those records characterized her cognitive impairment as mild, indicated that she could leave the facility without supervision and was not an elopement risk, and described her as independent in several ADLs. Dkts. 98-15 at JN 000337–55; 98-19 at JN 000498–510. The record also includes an August 26, 2022 telephone conversation in which a Normandy Park employee, identified only as "Kennedy," stated that, "as far as [she knew]," Pearcy was "mostly independent." Dkt. 102-14 at 166–68. The apparent inconsistencies among the care plans, Kennedy's prescription, Kemp's assessment, and the telephone statement create factual questions about the nature and extent of Pearcy's limitations. They do not establish as a matter of law that Kennedy's prescription was incapable of constituting an ADL certification. Moreover, Pearcy's independence in other respects is not necessarily inconsistent with a need for substantial assistance with two ADLs.

The record therefore presents a genuine dispute as to whether Kennedy certified that Pearcy satisfied the ADL Criterion in connection with the April 2022 Benefit Claim.

**b) The Cognitive-Impairment and Comparable-Disability Criteria**

Although plaintiff principally relies on the ADL Criterion, the Court also considers whether the records constitute a certification under either of the Policy's remaining alternatives.

No record from a qualifying LHCP during the relevant period certifies that Pearcy satisfied the Cognitive-Impairment Criterion. Kennedy's prescription does not address whether Pearcy had severe cognitive impairment or required substantial supervision to protect herself from threats to health or safety. The January 2022 Individual Service Plan signed by Berg characterized Pearcy's cognitive impairment as mild, recorded a Mini-Mental State Examination score of 23 out of 30, and indicated that she could navigate the facility, communicate and direct her own care, leave the community without a support person, and was not an elopement risk. Dkt. 98-15 at JN 000337–38, 000346, 000353–55. Those findings do not authoritatively attest that Pearcy required continual supervision because of severe cognitive impairment. Plaintiff's evidence that Pearcy had previously been diagnosed with Alzheimer's disease does not alter that conclusion. As explained above, an Alzheimer's diagnosis may satisfy the severity component but does not, standing alone, establish that an LHCP determined that the insured required substantial supervision.

Nor does any record certify that Pearcy satisfied the Comparable-Disability Criterion. Plaintiff does not separately develop an argument under that criterion, and none

of the records determines that Pearcy had a level of disability similar, as determined under the applicable regulations, to the level required under the ADL Criterion.

Accordingly, the record does not support a finding that an LHCP certified Pearcy under the Cognitive-Impairment or Comparable-Disability Criterion. A genuine dispute remains, however, as to whether Kennedy certified that Pearcy satisfied the ADL Criterion. Jackson therefore has not established as a matter of law that no qualifying LHCP certified Pearcy as chronically ill in connection with the April 2022 Benefit Claim.

**3) Whether any certification satisfied the 12-month requirement for the April 2022 Benefit Claim**

Jackson argues that the January 2020 records from Dr. Lloyd and Dr. Pense were too old to establish eligibility under the April 2022 Benefit Claim. Jackson is correct that any qualifying January 2020 certification, standing alone, could not establish continuous compliance with a requirement that certification occur at least once every twelve months. Even if Dr. Pense's January 30, 2020 note constituted a qualifying certification, it could not by itself establish that Pearcy remained properly certified more than two years later. However, that conclusion does not entitle Jackson to summary judgment on the April 2022 Benefit Claim. Berg signed the Individual Service Plan on January 25, 2022, and Kennedy issued her note on February 1, 2022. As explained above, the record would permit a reasonable jury to find that one or both documents constituted a qualifying certification under the ADL Criterion. Any such certification occurred within twelve months of at least the contemporaneous and prospective service periods included in the

April 2022 Benefit Claim. Jackson's reliance solely on the age of the January 2020 records therefore overlooks the potentially qualifying 2022 records.

The April 2022 Benefit Claim also sought benefits for services dating to 2020. Whether a qualifying certification supports each earlier service period must be determined on a period-specific basis. The February 2022 records do not necessarily establish compliance for all preceding periods, and any January 2020 certification does not establish uninterrupted compliance through February 2022. Jackson, however, has not matched the claimed service periods to the potentially qualifying certifications or identified a particular interval for which the absence of a timely certification entitles it to judgment. Accordingly, Jackson has not established as a matter of law that Pearcy failed to satisfy the Policy's twelve-month certification requirement for all periods encompassed by the April 2022 Benefit Claim. Whether a qualifying certification supports recovery for particular service periods remains to be determined in conjunction with the Policy's remaining coverage and proof-of-loss requirements.

Having addressed the chronic-illness certification requirement for both the 2019 Benefit Claim and the April 2022 Benefit Claim, the Court turns to Jackson's arguments concerning the qualified long-term-care services and a qualifying plan of care requirements.

**b. Qualified Long-Term-Care Services and Plan of Care**

**i. Governing Requirements**

The Policy defines "Qualified Long-Term Care" as:

> Necessary diagnostic, preventive, therapeutic, curing, treating, mitigating, and rehabilitative services, and Maintenance or Personal Services, which:
>
> 1. are required by a Chronically Ill individual; and
>
> 2. are provided pursuant to a Plan of Care prescribed by Licensed Health Care Practitioner.

Dkt. 98-1 at JN 000538. A "Plan of Care," in turn, is:

> A program of care and treatment:
>
> 1. initiated by and approved in writing by a Licensed Health Care Practitioner before the start of such care and treatment; and
>
> 2. confirmed in writing at least once every 60 days.

*Id*. at JN 000542. These provisions require plaintiff to establish two related matters. First, the claimed services must have been necessary because Pearcy was chronically ill and must fall within the categories identified in the Policy's definition of "Qualified Long-Term Care." Second, those services must have been provided pursuant to a written program of care that an LHCP initiated and approved before the care began—a "Plan of Care"—and that was confirmed in writing at least once every sixty days.

The Policy does not require a particular form, a document titled "Plan of Care," or a single writing containing every required element. The record must nevertheless reflect an LHCP's written initiation and approval of the program.

The Court addresses the 2019 and April 2022 Benefit Claims separately.

**ii. The 2019 Benefit Claim**

**1) Whether an LHCP initiated and approved a qualifying Plan of Care for the 2019 Benefit Claim**

Plaintiff relies on several writings to establish that Pearcy's care at Normandy Park was provided pursuant to a qualifying Plan of Care. In an April 24, 2019 office note, Dr. Pense stated that Pearcy "does need help at home," referred her to "Place for MOM," increased her dementia medication, and ordered a neuropsychological evaluation. Dkt 116. Ex. 6 at MULTICARE 000382–83. Plaintiff also cites August and September 2019 records showing that Normandy Park requested a signed medication list and "physical orders" from Dr. Pense's office and that his office faxed signed materials to the facility before Pearcy's admission. *Id.* at MULTICARE 000253–57, 000263–65. Finally, Normandy Park prepared an Individual Service Plan dated September 18, 2019, the date Pearcy entered the facility. The plan identified mild cognitive impairment and memory loss as secondary diagnoses, provided for daily medication assistance, and otherwise described Pearcy as largely independent. It was signed by Kayla Hawkins, Normandy Park's resident service director. Dkt. 98-4 at JN 000119–23.

Even viewed collectively and in the light most favorable to plaintiff, these writings do not permit a reasonable jury to find that an LHCP initiated and approved a Plan of Care before Pearcy began receiving the claimed services. Dr. Pense's April 2019 note documented that Pearcy needed help and referred her to a placement resource, but it did

not identify or approve a particular program of care or treatment at Normandy Park. The later chart entries show that his office sent signed materials to the facility, but the materials in the record consist principally of medication information and do not prescribe the services, supervision, or personal care Pearcy was to receive. Normandy Park's Individual Service Plan describes such a program, but Hawkins signed it, and plaintiff has not shown that she qualified as an LHCP or that Dr. Pense reviewed and approved the plan in writing. Evidence that Dr. Pense facilitated Pearcy's admission and authorized her medications does not establish that he prescribed the facility's service plan as the Policy requires.

Plaintiff also has not identified a writing confirming any purported Plan of Care within sixty days. Normandy Park's service plan was signed on September 18, 2019. The December 16, 2019 assessment arranged by Jackson was completed nearly ninety days later and independently evaluated Pearcy's condition and functioning; it did not purport to confirm the facility's service plan. Dkt. 98-6 at JN 000145–86. Plaintiff identifies no other writing confirming the program within the initial sixty-day period or at the required intervals thereafter.

Plaintiff attributes the absence of a qualifying Plan of Care to Jackson's failure to request one from Pearcy's treating providers or advise Larson that additional documentation was required. That contention may bear on the reasonableness of Jackson's investigation and administration of the claim, but it does not establish compliance with the Policy's contractual requirements.

Accordingly, Jackson has established that the services encompassed by the 2019 Benefit Claim were not provided pursuant to a Plan of Care initiated and approved in writing by an LHCP before the care began and confirmed in writing every sixty days. Because a qualifying Plan of Care is required for services to constitute "Qualified Long-Term Care," that deficiency independently precludes contractual recovery under the 2019 Benefit Claim. The Court therefore need not separately determine whether the claimed services otherwise fell within the categories covered by the Policy. Jackson is entitled to summary judgment on the breach-of-contract claim arising from the 2019 Benefit Claim.[8]

**iii. The April 2022 Benefit Claim**

**1) Whether an LHCP initiated and approved a qualifying Plan of Care for the April 2022 Benefit Claim**

The record concerning the April 2022 Benefit Claim includes the January 25 care documents. As stated earlier, the assessment evaluated Pearcy's condition and identified her functional and care needs, while the Individual Service Plan set forth a corresponding program of services to address those needs. Although the assessment identifies Madden, an LPN, as the evaluator, the Individual Service Plan was also signed by Berg, who qualified as an LHCP. Dkt. 98-15 at JN 000337, 000368–73. Berg's signature would

[8] Jackson alternatively argues that the claim fails because plaintiff did not submit adequate and timely proof of loss. As discussed above, however, Jackson has not identified the relevant service periods, established when proof was due for each period, or shown that plaintiff's submissions were inadequate as a matter of law. Nor has Jackson established actual prejudice resulting from any delay. The proof-of-loss requirement therefore does not provide an independent basis for summary judgment on the entirety of the 2019 Benefit Claim. Because the absence of a qualifying plan of care independently resolves the claim, the Court does not address the remaining period-specific proof-of-loss issues.

permit a reasonable jury to find that an LHCP approved in writing the program of care reflected in the Individual Service Plan. Kennedy's February 1, 2022 prescription provides additional support for that conclusion. As noted above, Kennedy directed Pearcy to live in an assisted-living facility because she required assistance with ADLs. Dkt. 101-5 at 2. Read together, the Individual Service Plan and Kennedy's directive would permit a reasonable jury to find that an LHCP initiated and approved a program of assisted-living and ADL-related care.

The January 25 care documents cannot establish that services rendered before that date were provided pursuant to the program of care they describe. Pearcy's preexisting residence at Normandy Park does not, however, prevent plaintiff from relying on those documents for later services. The assessment documented a change in Pearcy's condition and the accompanying Individual Service Plan prescribed a corresponding program of care. A reasonable jury could therefore find that services provided on or after January 25, 2022, were furnished pursuant to a Plan of Care initiated and approved in writing before those services began.

Jackson is therefore entitled to summary judgment on the portions of the April 2022 Benefit Claim seeking benefits for services rendered before January 25, 2022, because plaintiff has identified no writing showing that an LHCP initiated and approved the relevant care before those services began. Jackson has not, however, established that no qualifying Plan of Care existed for services rendered on or after January 25, 2022. The

Court next considers whether that plan was confirmed in writing at least once every 60 days.

**2) Whether the qualified Plan of Care was confirmed in writing at least once every sixty days for the April 2022 Benefit Claim**

For purposes of periodic confirmation, the Policy requires only that the Plan of Care be "confirmed in writing at least once every 60 days." Dkt. 98-1 at JN 000542. Unlike the preceding clause governing initiation and approval, the confirmation provision does not specify that the confirmation must be made by an LHCP, signed, or set forth in any particular form. The Court therefore will not impose those additional requirements. *See Seattle Tunnel Partners*, 200 Wn.2d at 321 (clear and unambiguous policy language must be enforced as written and may not be modified). To constitute a confirmation, however, the writing must at least reaffirm that the prescribed program of care remained in effect. Viewed in the light most favorable to plaintiff, Kennedy's February 1 directive could constitute such a confirmation. By directing Pearcy to live in an assisted-living facility because she required assistance with ADLs, Kennedy reaffirmed the basic program of assisted-living and ADL-related care described in the January 25 Individual Service Plan. Dkt. 101-5 at 2.

Assuming Kennedy's directive served as a confirmation, the next written confirmation was required by April 2, 2022. Plaintiff has not identified a writing by that date reaffirming that the January program remained in effect. Although Jackson received claim-related forms and cognitive-testing information later in April, plaintiff does not

contend that those materials confirmed the Plan of Care. Plaintiff instead emphasizes that Jackson never requested periodic confirmations from Pearcy's treating providers. That contention may bear on plaintiff's extracontractual claims, but it does not establish compliance with the Policy's coverage requirement.

The record also contains the May 18 care documents, which Jackson later obtained while investigating the claim. Dkt. 98-19 at JN 000498–514. Although plaintiff does not expressly characterize those documents as a new written confirmation, the May assessment reevaluated Pearcy's condition, and the accompanying Individual Service Plan set forth the program of services then in effect. Jackson itself treated the May 18 care documents as Pearcy's then-current Plan of Care. A reasonable jury could therefore find that they constituted a new written confirmation as of May 18. Because the documents were not created until that date, however, they could not cure the preceding lapse in compliance.

Jackson has therefore established the absence of a timely written confirmation for services rendered after April 2 and before May 18, 2022. It has not established the absence of a written confirmation as of May 18 or shown that the 60-day requirement defeats the April 2022 Benefit Claim in its entirety.

**3) Whether the benefits sought were for necessary services provided pursuant to that Plan**

Jackson further argues that plaintiff has not connected the claimed expenses to services required because Pearcy was chronically ill or shown that those services were

provided pursuant to a qualifying Plan of Care. It emphasizes that Pearcy could perform many tasks independently, smoke safely, and leave Normandy Park without supervision. According to Jackson, evidence of "abstract assistance" is insufficient; plaintiff must identify the care prescribed by the Plan of Care and show that Pearcy actually received it.

To the extent Jackson relies on Pearcy's ability to leave the facility and function independently, that evidence bears principally on whether she required continual supervision because of severe cognitive impairment. As discussed above, however, a reasonable jury could find that Kennedy certified Pearcy under the alternative ADL Criterion. Pearcy's independence in other respects therefore does not resolve whether she required assistance with at least two ADLs. The relevant question is whether the Plan of Care prescribed services required because of those ADL limitations and whether Pearcy received the prescribed services.

Viewed in the light most favorable to plaintiff, the January 25 care documents and Kennedy's directive would permit a reasonable jury to find that Pearcy was prescribed personal-care services addressing her ADL limitations. The assessment documented Pearcy's need for standby assistance with bathing. The accompanying Individual Service Plan incorporated that need into a broader program of care, prescribed assistance with Pearcy's morning and evening routines and other interventions and linked the prescribed interventions to a monthly care-level fee of $1,746. Dkt. 98-15 at JN 000368–73. Kennedy then directed Pearcy to live in an assisted-living facility because she required assistance with multiple ADLs. Dkt. 101-5 at 2. The same July 14, 2022 Claimant Care

Needs Assessment Form discussed above provides evidence that Pearcy received the relevant services: it reported that she received standby assistance with bathing and dressing, as well as assistance with medication administration. Dkt. 102-16 at 2. These records would permit a reasonable jury to find that, during periods in which the chronic-illness certification and Plan-of-Care requirements were satisfied, Pearcy received maintenance or personal-care services prescribed by the plan and required because of the ADL limitations underlying Kennedy's asserted certification.

The record does not establish, however, that every expense included in the April 2022 Benefit Claim was covered. Normandy Park charged Pearcy a base residential rate in addition to fees based on her assessed care needs. Although the Individual Service Plan connects the care-level fee to particular interventions, the parties have not adequately addressed whether the base residential charge or other invoiced amounts were attributable to covered services. Nor have they matched each charge to the periods in which Pearcy was certified as chronically ill and a qualifying Plan of Care was in effect and timely confirmed.

Accordingly, Jackson has not established as a matter of law that Pearcy received no Qualified Long-Term Care Services during the potentially covered portions of the April 2022 Benefit Claim. Whether particular charges were attributable to necessary services provided pursuant to a qualifying Plan of Care, and the benefits recoverable for the qualifying service periods, remain for trial.

**c. Proof-of-Loss Issue for the Remaining Portions of the April 2022 Benefit Claim**

The Policy addresses both the manner and timing of submitting proof of loss. Under the heading "How to File a Claim," it provides:

> We will send You a claim form within 15 days after We receive notice of Your claim. If We do not, You can meet the requirements of providing Us with a written proof of loss by sending Us a written statement describing the type and nature of Your loss.

Dkt. 98-1 at JN 000552. The immediately following provision, entitled "When to File a Claim," states:

> You must send Us written proof of loss within 90 days after the end of the period for which You are claiming benefits.
>
> If this is not possible, Your claim will not be affected. However, unless You are legally incapable, You must notify Us within one year from the time proof is otherwise required.

*Id*. The Policy further provides that Jackson "will pay Your claim immediately after We receive due written proof of loss." *Id*. at JN 000553.

As explained above, these provisions impose a proof-of-loss requirement regardless of whether Jackson supplies a claim form. Written proof ordinarily must be provided within 90 days after the end of the period for which benefits are claimed. If submission within that period is not possible, the claim is not affected, subject to the Policy's one-year limitation absent legal incapacity. Payment is conditioned on Jackson's receipt of "due" written proof.

Jackson contends that the materials submitted in connection with the April 2022 Benefit Claim did not timely and adequately document the claimed services and expenses, particularly those incurred before the claim was initiated. Plaintiff argues that the claim forms, invoices, facility records, and other materials supplied during the claim process satisfied the Policy and that Jackson neither identified inadequate proof of loss as a basis for denial nor requested additional records from Pearcy's treating providers. Both parties seek summary judgment on this issue.

Jackson has not established that the proof-of-loss requirement defeats the portions of the April 2022 Benefit Claim that remain potentially covered. After Larson initiated the claim on April 1, 2022, Normandy Park submitted claim-related forms on April 21, additional cognitive information on April 28, the January 25 care documents on May 12, and invoices on May 17 covering expenses through May 2022. Jackson received the completed Claimant Care Needs Assessment on July 14 and, after reopening the claim, the May 18 care documents on August 26. Collectively, those materials described Pearcy's diagnoses, functional limitations, care needs, and services and identified the periods and amounts billed.

Jackson's contention that the Policy permits only a 90-day "lookback" from the date a claim is initiated is inconsistent with the Policy's language. The deadline runs from "the end of the period for which" benefits are claimed, not backward from the date Jackson receives notice of the claim. Thus, the Policy does not categorically limit recovery to services provided during the 90 days preceding the initiation of a claim. To

establish that proof was untimely, Jackson must identify the relevant service period, determine when proof for that period became due, and show that the necessary proof was not furnished within the applicable time. Jackson has not identified any particular potentially covered service period in 2022 for which the necessary proof was first submitted after the applicable deadline. Its motion therefore cannot be granted on the theory that proof for all earlier service periods was categorically untimely.

Plaintiff likewise has not established that she is entitled to judgment as a matter of law on the proof-of-loss issue in its entirety. Although the Policy does not impose the categorical 90-day lookback Jackson advocates, it does require due written proof within 90 days after the end of each period for which benefits are claimed, subject to the Policy's exception when timely submission is not possible. Plaintiff has not matched the materials submitted during the claim process to each potentially covered service period or established that those materials constituted due written proof of every surviving claimed loss within the applicable time. Jackson's failure to establish that the proof-of-loss requirement bars all remaining losses does not establish plaintiff's compliance as to each particular loss.

Accordingly, Jackson's motion for summary judgment based on inadequate or untimely proof of loss is denied. Plaintiff's motion is granted to the extent she seeks rejection of Jackson's contention that the Policy imposes a categorical 90-day lookback measured from the date a claim is initiated. Her motion is otherwise denied.

**2. Extracontractual Claims**

Plaintiff's surviving bad-faith, IFCA, and WCPA claims arise from substantially overlapping claims-handling conduct. Plaintiff moves for summary judgment on her bad-faith and WCPA claims, while Jackson moves for summary judgment on all three extracontractual claims. Although each cause of action has distinct elements, all turn in significant part on whether Jackson reasonably investigated and evaluated the benefit requests underlying the surviving theories, adequately communicated the information and documentation it required, and reasonably interpreted and applied the Policy to the evidence before it. The Court therefore first addresses the reasonableness of Jackson's handling of the reconsideration of the 2019 Benefit Claim and its handling of the April 2022 Benefit Claim and then considers only the additional elements necessary to resolve each cause of action.

**a. Governing Principles**

Washington law imposes on insurers a duty of good faith in dealing with their insureds. RCW 48.01.030. A common-law bad-faith claim is analyzed under ordinary tort principles: duty, breach, and damages proximately caused by the breach. *Smith v. Safeco Insurance Co.*, 150 Wn.2d 478, 485 (2003). To establish breach, the insured must show that the insurer's conduct was unreasonable, frivolous, or unfounded. *St. Paul Fire & Marine Insurance Co. v. Onvia, Inc.*, 165 Wn.2d 122, 130 (2008). Whether an insurer acted unreasonably is generally a question of fact and may be resolved on summary

judgment only when there are no disputed material facts concerning reasonableness and reasonable minds could reach only one conclusion. *Smith*, 150 Wn.2d at 484–86.

An insurer does not act in bad faith merely because its coverage decision is ultimately determined to be incorrect; a denial based on a reasonable interpretation of the policy does not support bad-faith liability. *Overton v. Consolidated Insurance Co*., 145 Wn.2d 417, 433 (2002). The insurer's duty, however, extends beyond reaching a defensible coverage determination. It must conduct a reasonable investigation before denying benefits and may be liable for an unreasonable investigation even if a complete investigation ultimately would have established that the loss was not covered. *Coventry*, 136 Wn.2d at 279–81.

IFCA authorizes a first-party claimant who is unreasonably denied a claim for coverage to recover the actual damages sustained, together with litigation costs and reasonable attorney fees. RCW 48.30.015(1), (3). IFCA does not create an independent cause of action based solely on a violation of Washington's insurance regulations; the claimant must establish an unreasonable denial of coverage or payment. *Perez-Crisantos v. State Farm Fire & Casualty Co*., 187 Wn.2d 669, 680, 684 (2017). Regulatory violations may nevertheless bear on the reasonableness of the denial and on the remedies available under the statute.

To prevail under the WCPA, plaintiff must establish: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) affecting the public interest; (4) injury to her business or property; and (5) a causal link between the challenged act and

the injury. *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co*., 105 Wn.2d 778, 784–85 (1986). WAC 284-30-330 identifies specific insurer claims-handling practices as unfair or deceptive acts, including failing to adopt reasonable standards for investigating claims and refusing payment without conducting a reasonable investigation. WAC 284-30-330(3)–(4). A single violation of the regulation constitutes a per se unfair trade practice and, in the insurance context, establishes the first three elements of a WCPA claim. *Industrial Indemnity Co. of the Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 923–24 (1990); *Keodalah v. Allstate Insurance Co*., 194 Wn.2d 339, 350–51 (2019).

**b. Reasonableness of Jackson's Claim Handling**

**i. Reconsideration of the 2019 Benefit Claim**

As determined above, plaintiff's bad-faith claim is untimely to the extent it rests on Jackson's investigation and denial of the 2019 Benefit Claim on or before January 3, 2020. The surviving question is whether Jackson reasonably investigated and evaluated the new information Larson submitted with her February 2020 request for reconsideration.

Larson's reconsideration submission included Dr. Lloyd's January 9, 2020 neuropsychological evaluation, which had not been available when Jackson initially denied the claim. As discussed above, the report diagnosed major neurocognitive disorder due to Alzheimer's disease and documented significant cognitive and functional limitations, while also stating that Pearcy remained independent in self-care and appeared to be functioning well in assisted living. In a March 11, 2020 letter, Jackson advised

Pearcy that the request had been referred to claims management for a second review, that management might require additional information, and that Jackson would notify her if additional information was needed. Dkt. 126-1 at 2.

A March 31, 2020 internal reconsideration review summarized Dr. Lloyd's January 2020 neuropsychological evaluation and considered it together with the September 2019 service plan, Larson's November 2019 submission, the December 2019 benefit-eligibility assessment, and a January 2, 2020 clarification call with Normandy Park. The care manager recommended upholding the denial because the file did not show that Pearcy required assistance with two ADLs or substantial supervision. Dkt. 98-11 at illumifin_001413. The review further stated that medical records had not been requested because, according to the earlier eligibility assessment, Pearcy had not seen medical providers for several months before entering the facility. *Id*. On April 1, 2020, CNA claims management agreed with the recommendation. *Id*. at illumifin_001411.

Plaintiff contends that Jackson's reconsideration was unreasonable because Dr. Lloyd's newly submitted diagnosis and testing bore directly on whether Pearcy's cognitive impairment was severe and whether she required substantial supervision, and materially conflicted with the earlier facility records characterizing her impairment as mild, yet Jackson made no effort to resolve that conflict. Plaintiff further emphasizes that the benefit-eligibility assessment was not uniformly supportive of denial: it recorded that Pearcy needed daily reminders of the date, day, or time of day; reportedly was unable to recognize family or friends monthly; reportedly experienced monthly delusions or

agitation and suspiciousness or paranoia; and had a history of getting lost outside her home. Rule 30(b)(6) testimony from Jackson and illumifin indicated that the claim file reflected no direct contact with Dr. Lloyd, Dr. Pense, or Nurse Practitioner Chapman, no request for their complete records, and no independent medical review of Dr. Lloyd's report. Dkts. 102-2 at 147–50; 102-8 at 154–55, 168–70. The testimony further provided that a CNA guideline mentioned ordering additional information to resolve conflicting evidence, although CNA had no specific procedure or training governing when medical records should be requested. Dkt. 102-2 at 172–73.

A reasonable jury could find Jackson's explanation for not pursuing those records inadequate. Its stated rationale—that Pearcy had not seen a provider for several months before entering Normandy Park—derived from the earlier eligibility assessment and did not account for the January 2020 neuropsychological evaluation that prompted reconsideration. Larson's submission also identified Chapman's neurological assessment and related testing, as well as Dr. Pense's longstanding treatment of Pearcy. An insurer may act unreasonably by failing to pursue a potentially material line of inquiry identified in the claim materials. *See Kallevig*, 114 Wn.2d at 917. Given Jackson's authorization to obtain records and its acknowledgment that additional information might be necessary, a jury could find that the newly identified medical evidence warranted further inquiry and that Jackson acted unreasonably by relying on the earlier facility records without seeking clarification. A jury could also consider that Jackson did not expressly advise Larson that Dr. Lloyd's professional status prevented his report from serving as the required

certification or identify the need for a certification from a practitioner who qualified under the Policy.

The record does not, however, establish unreasonableness as a matter of law. Jackson did not disregard Dr. Lloyd's report. The care manager summarized and evaluated it, reviewed the existing claim file, and submitted a documented recommendation that CNA claims management approved. Jackson's correspondence also directed Larson generally to the applicable Policy definitions. Moreover, Dr. Lloyd did not qualify as an LHCP, and his report did not determine that Pearcy required substantial assistance with two ADLs or continual supervision, prescribe a qualifying Plan of Care, or otherwise establish every condition of coverage. Although the benefit-eligibility assessment contained the cognitive and behavioral concerns identified above, it also indicated that Pearcy generally performed her ADLs without another person's assistance and recorded a Mini-Mental State Examination score of 24 out of 30. The September 2019 service plan separately reported no wandering or behavioral concerns.

Accordingly, neither party has established as a matter of law that Jackson's investigation and evaluation of the reconsideration request was—or was not—reasonable. Their motions are denied as to that issue.

**ii. The April 2022 Benefit Claim**

The April 2022 Benefit Claim presented Jackson with conflicting evidence concerning Pearcy's functional limitations and care needs. Jackson argues that it reasonably investigated the claim by repeatedly seeking and obtaining updated facility

records and contacting Normandy Park to clarify the information it received. Plaintiff contends that Jackson failed to reconcile material discrepancies in those records, relied on an inadequately informed facility employee, and did not seek information from the employees best positioned to clarify Pearcy's needs.

With respect to the April 2022 Benefit Claim, Normandy Park initially submitted a partially completed Claimant Care Needs Assessment form on April 21, 2022, followed on May 12 by the January 25 care documents. Because the Claimant Care Needs Assessment form was incomplete and the only facility care documents then on file reflected Pearcy's condition and care needs as of January, Jackson repeatedly contacted Normandy Park and Larson seeking a completed assessment and a more current Plan of Care or, if none existed, a newly completed plan. Dkt. 98-3 at JN 001029–39. On July 14, 2022, Katie Kemp, Normandy Park's executive director and a certified nursing assistant, completed the Claimant Care Needs Assessment form. The assessment reported that Pearcy received standby assistance with bathing and dressing, as well as assistance with medication administration. After reviewing Kemp's July assessment, Shannon Pietroski, the care manager handling the claim for illumifin, called Normandy Park on August 24 to clarify the apparent discrepancy between that assessment—which reported standby assistance with bathing and dressing—and the January 25 care documents, which specifically documented such assistance only with bathing. *Id*. at JN 001042. Because Kemp was temporarily away from the facility, Pietroski requested Normandy Park's most

recent care plan. *Id*. at JN 001042–44. Normandy Park supplied the May 18 care documents on August 26. *Id*. at JN 001045.

Pietroski then called the facility again and asked to speak with a nursing staff member familiar with Pearcy's care and the May 18 documents. *Id*.; Dkt. 102-14. During the call, Pietroski explained that the May 18 Individual Service Plan identified Pearcy as independent in eating and dressing but did not specifically address bathing, toileting, or transferring. Dkt. 102-14 at 167–68. She also noted that the January 25 care documents had provided for set-up and standby assistance with bathing. The Normandy Park employee, identified in the transcript only as "Kennedy," responded that, "as far as [she knew]," Pearcy was "mostly independent" and confirmed that the May 18 Individual Service Plan reflected the care Pearcy was then receiving. *Id*. When asked whether the omission of toileting and transferring meant that Pearcy was independent in those activities, Kennedy answered yes. *Id*. at 168. The transcript does not identify Kennedy's title or establish the extent of her familiarity with Pearcy's care. Nor does it indicate that Pietroski advised her that Kemp's July assessment reported standby assistance with both bathing and dressing or that Pietroski directly clarified whether Pearcy remained independent in bathing. *Id*. at 166–68.

A reasonable jury could find that Jackson did not adequately resolve the conflicting evidence before denying benefits. The January 25 care documents documented standby assistance with bathing and daily staff involvement in Pearcy's routines. The May 18 Individual Service Plan identified Pearcy as independent in

dressing but did not specifically address bathing, while Kemp's July assessment reported standby assistance with both bathing and dressing. Although Jackson was advised that Kemp would return to the facility within days, it did not speak with her or ask another employee to explain the basis for her responses. Instead, it relied on a qualified statement from an employee whose role and familiarity with Pearcy were not established and who did not directly reconcile the conflicting information concerning bathing and dressing. Jackson's internal Decision Summary Report, which incorporated the August 26 call, accurately recorded the conflicting written evidence but nevertheless classified Pearcy as "Independent—No Assist" in both activities. Dkt. 98-20 at illumifin_001439, 001442–46. The report does not explain why the qualified telephone response displaced the written assessments or how the call established independence in activities that were not specifically clarified.

That evidence is sufficient to preclude summary judgment for Jackson, but it does not establish unreasonableness as a matter of law. Jackson repeatedly sought a completed Claimant Care Needs Assessment and updated facility care plan, advised Larson what facility record remained outstanding, obtained the May 18 care documents, and contacted Normandy Park for clarification. The May 18 Individual Service Plan was Normandy Park's then-current service plan, and the employee contacted on August 26 confirmed that it reflected the care Pearcy was then receiving. The facility records also characterized Pearcy's impairment as mild, stated that she was not an elopement risk, and indicated that she could leave the facility and perform many activities independently. Moreover, Kemp

was not an LHCP, and her assessment conflicted with the May 18 Individual Service Plan as to dressing and with the August 26 employee's understanding of Pearcy's then-current care. This evidence would permit a reasonable jury to find that Jackson reasonably relied on those materials and the facility's follow-up response.

Accordingly, neither party has established as a matter of law whether Jackson reasonably investigated and evaluated the April 2022 Benefit Claim. Their motions are denied as to that issue.

**c. The Bad-Faith Claim**

As explained above, genuine disputes of material fact remain as to whether Jackson reasonably handled both the reconsideration of the 2019 Benefit Claim and the April 2022 Benefit Claim. Those disputes preclude summary judgment for either party on the breach element of plaintiff's bad-faith claim. They do not, however, resolve the parties' motions because plaintiff must also establish that the allegedly unreasonable claims handling caused compensable harm. *Coventry*, 136 Wn.2d at 284–85.

Jackson is entitled to summary judgment on the bad-faith claim to the extent it arises from the reconsideration of the 2019 Benefit Claim. Although the absence of coverage does not itself foreclose a bad-faith claim, plaintiff must prove actual harm proximately caused by the allegedly unreasonable investigation. *Id*. at 281, 284–85. Because the Court has determined that Pearcy was not entitled to benefits for the relevant periods, the nonpayment of those benefits cannot supply the required harm. *Id*. at 284–85 (holding that, where the claimed loss was not covered, the insured was not entitled to

coverage by estoppel or a return of premiums and could recover only damages resulting from the bad-faith investigation); *St. Paul Fire & Marine*, 165 Wn.2d at 133–34 (when coverage is unavailable, the insured must prove actual harm caused by the claims-handling breach, and recovery is limited to damages resulting from that breach). Plaintiff has not identified evidence of investigative expenses, tort damages, or any other loss caused by Jackson's handling of the reconsideration.

The bad-faith claim arising from the April 2022 Benefit Claim, however, presents disputed questions of both breach and harm. The Court has concluded that genuine disputes remain regarding Pearcy's eligibility for benefits for portions of that claim and the reasonableness of Jackson's investigation and denial. If a jury finds that benefits were payable and that Jackson unreasonably investigated or denied the claim, it could also find that the resulting nonpayment and continued premium obligations harmed Pearcy. Jackson's contention that a different investigation necessarily would have produced the same result therefore depends on coverage and causation issues that cannot be resolved as a matter of law. Neither party is entitled to summary judgment on the bad-faith claim arising from the April 2022 Benefit Claim.

**d. The IFCA Claim**

As determined above, plaintiff's IFCA claim arising from the 2019 Benefit Claim is time-barred. The surviving claim therefore concerns only Jackson's denial of the April 2022 Benefit Claim. It is undisputed that Pearcy was a first-party claimant and that Jackson denied coverage and payment of benefits. The remaining questions are whether

that denial was unreasonable and caused actual damages. *See* RCW 48.30.015(1); *Perez-Crisantos*, 187 Wn.2d at 683–84.

Those questions cannot be resolved as a matter of law. As discussed above, genuine disputes remain concerning both Pearcy's entitlement to benefits for portions of the April 2022 Benefit Claim and the reasonableness of Jackson's investigation and denial. If a jury finds that benefits were payable and that Jackson unreasonably denied them, the unpaid benefits may constitute actual damages caused by the denial. Jackson is therefore not entitled to summary judgment on the surviving IFCA claim.

Jackson's reliance on the Office of the Insurance Commissioner's September 6, 2022 response does not require a different result. The OIC stated that the criteria for benefits had not been met and that Jackson "appear[ed] to be in compliance with the policy and not in violation of state regulations." Dkt. 98-23 at 2–3. The OIC also expressly acknowledged, however, that it lacked authority to decide disputed questions of fact, law, or contract interpretation and that such determinations were reserved for the courts. *Id.* at 3. The Court need not resolve plaintiff's evidentiary objection because, even assuming the response is admissible and considering it as evidence supporting Jackson's position, it does not eliminate the factual disputes identified above.

**e. The WCPA Claim**

Plaintiff principally relies on WAC 284-30-330(3), which prohibits an insurer from failing to adopt and implement reasonable standards for the prompt investigation of claims, and WAC 284-30-330(4), which prohibits refusing to pay a claim without

conducting a reasonable investigation. As explained above, genuine disputes remain concerning the reasonableness of Jackson's handling of both the reconsideration of the 2019 Benefit Claim and the April 2022 Benefit Claim. Those disputes preclude summary judgment for either party on whether Jackson violated WAC 284-30-330(4).

Plaintiff's theory under WAC 284-30-330(3) likewise presents factual disputes. Plaintiff relies on testimony concerning the absence of Washington-specific claims-handling training, formal Alzheimer's-specific training, and written procedures expressly addressing the duty to conduct a fair investigation or specifying when treating-provider records should be obtained. Jackson, however, points to evidence that illumifin provided its claims personnel with onboarding, claims-systems, and role-specific training and that Continental provided additional instruction concerning new guidelines and procedures. Dkt. 113, Ex. 2, Fersten Dep. 18:10–12, 86:5–87:4, 88:19–21. Jackson further relies on CNA's Certification of Chronic Illness procedure. Evan Krasnow, Jackson's Rule 30(b)(6) designee and a Continental employee who served as a claims quality-assurance consultant during the relevant period, testified that the procedure addressed "the process of determining if an insured is able to be certified as chronically ill," and confirmed that it directed the care coordinator or care manager to review the claim documentation and "order additional requirements as appropriate." Dkt. 113-1, Krasnow Dep. 107:8–12, 114:12–23. Krasnow further testified that conflicting information could require additional evidence, including medical records. *Id*. at 115:14–25. He also confirmed that, when an LHCP's assessment indicated that the claimant did not satisfy the chronic-illness criteria

but other claim-file materials supported the opposite conclusion, the procedure directed the in-house LHCP to refer the file for additional investigation. *Id*. at 123:16–124:1. A reasonable jury could find either that the training and procedures, together with the claims-handling process described above, reflected the adoption and implementation of reasonable investigative standards or that they left consequential investigative decisions to insufficiently guided discretion. Neither party is therefore entitled to summary judgment on whether Jackson violated WAC 284-30-330(3).

The foregoing conclusions address only the unfair-or-deceptive-act element. Plaintiff must also establish injury to business or property and causation to prevail on her WCPA claim. Those elements produce different results for the two benefit claims.

Jackson is entitled to summary judgment to the extent the WCPA claim arises from the 2019 Benefit Claim. The Court has determined that Pearcy was not entitled to benefits for that claim because her care was not provided pursuant to a qualifying Plan of Care. The unpaid benefits therefore cannot constitute an injury caused by the allegedly unfair claims handling, and plaintiff identifies no evidence that the reconsideration caused any other injury to Pearcy's business or property. In particular, plaintiff has not shown that Jackson's conduct caused Pearcy to pay premiums she otherwise would not have paid.

The WCPA claim arising from the April 2022 Benefit Claim, however, must proceed to trial. Genuine disputes remain concerning whether Pearcy was entitled to benefits for portions of that claim, whether Jackson violated WAC 284-30-330(3) or (4),

and whether the challenged conduct caused the nonpayment of covered benefits. If the jury resolves those issues in plaintiff's favor, the unpaid benefits—and any premiums that would have been waived had benefits been paid—may constitute injury to property caused by the unfair practice. For the reasons stated in the IFCA analysis, the OIC's response does not eliminate those factual disputes. Accordingly, plaintiff's motion for summary judgment on the WCPA claim is denied. Jackson's motion is granted as to the WCPA claim arising from the 2019 Benefit Claim but denied as to the claim arising from the April 2022 Benefit Claim.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Jackson's Motion for Summary Judgment (Dkt. 96) is GRANTED in part and DENIED in part.

The motion is GRANTED as to:

- plaintiff's breach-of-contract claim arising from the 2019 Benefit Claim;
- plaintiff's breach-of-contract claim arising from the April 2022 Benefit Claim to the extent it seeks benefits for services rendered before January 25, 2022, or after April 2 and before May 18, 2022;
- plaintiff's IFCA claim arising from the 2019 Benefit Claim;
- plaintiff's bad-faith claim arising from the 2019 Benefit Claim, including both the time-barred conduct completed on or before January 3, 2020, and the later reconsideration, as to which plaintiff has not identified compensable harm; and

- plaintiff's WCPA claim arising from the 2019 Benefit Claim.

The motion is DENIED as to:

- plaintiff's breach-of-contract claim arising from the remaining portions of the April 2022 Benefit Claim;
- plaintiff's bad-faith claim arising from the April 2022 Benefit Claim;
- plaintiff's IFCA claim arising from the April 2022 Benefit Claim; and
- plaintiff's WCPA claim arising from the April 2022 Benefit Claim.

Jackson's motion is also DENIED insofar as it seeks summary judgment based on the Policy's contractual limitations provision or a categorical application of the proof-of-loss provision. The proof-of-loss provision remains available as a period-specific defense to the portions of the April 2022 Benefit Claim that otherwise remain potentially covered.

2. Plaintiff's Motion for Partial Summary Judgment (Dkt. 99) is GRANTED in part and DENIED in part.

- The motion is GRANTED to the extent plaintiff challenges Jackson's contention that the Policy imposes a categorical 90-day lookback measured from the date a claim is initiated.
- The motion is DENIED in all other respects, including to the extent plaintiff seeks a categorical determination that the proof-of-loss requirement did not apply, that the materials submitted constituted timely and adequate proof of every remaining claimed loss, or that Jackson may not rely on the provision as a period-specific defense.

3. No claims arising from Jackson's handling or denial of the 2019 Benefit Claim remain for trial. Plaintiff's remaining breach-of-contract claim concerns the potentially covered portions of the April 2022 Benefit Claim not resolved above. Her remaining bad-faith, IFCA, and WCPA claims likewise arise solely from Jackson's handling and denial of the April 2022 Benefit Claim.

4. The parties' motions concerning expert testimony will be resolved by separate order.

Dated this 4th day of August 2026.

Robert S. Lasnik
United States District Judge